**Kathryn STROM, Plaintiff–Appellant,**

v.

**GOLDMAN, SACHS & CO. and Goldman, Sachs & Co. Supplemental Life Insurance Plan, Defendants–Appellees.**

**Docket No. 98–7090.**

United States Court of Appeals, Second Circuit.

Argued Sept. 18, 1998.

Decided Aug. 24, 1999.

Jay P. Levy–Warren, Vladeck, Waldman, Elias & Engelhard, New York City, for Plaintiff–Appellant.

Michael J. Dell, Kramer, Levin, Naftalis & Frankel, LLP, New York City, for Defendants–Appellees.

Before: KEARSE, Circuit Judge, BRIEANT * and KAPLAN,** District Judges.***

KAPLAN, District Judge.

Plaintiff's late husband applied to purchase certain group life insurance upon his employment by defendant Goldman, Sachs & Co. ("Goldman"). The application was approved, but Goldman's alleged negligence in dealing with the application delayed its effective date until four days after the death of the insured. Plaintiff here seeks reversal of the judgment of the United States District Court for the Southern District of New York, Jed S. Rakoff, *Judge*, dismissing her complaint against the benefit plan and Goldman.

**I**

■ This case comes to us on appeal from an order entered on defendants' motion to dismiss the complaint. We therefore accept as true the well pleaded factual allegations of the complaint and any inferences reasonably drawn therefrom.[1]

Goldman hired plaintiff's late husband, Jonathan Strom, as an executive director in its investment banking department on January 13, 1994. As a full time employee, Strom automatically qualified on his first day of employment for $150,000 in life insurance coverage under Goldman's basic plan. He was eligible also to receive up to an additional $1 million in life insurance coverage under the Goldman, Sachs & Co. Supplemental Life Insurance Plan (the "Plan"), the first $500,000 of which was guaranteed issue and the balance subject to submission of evidence of good health acceptable to the carrier.

On or about January 14, 1994, Strom filled out the life insurance forms provided to him by Goldman, the Plan sponsor and administrator, electing to receive the maximum $1 million in coverage and designating plaintiff as his beneficiary under both the Plan and the basic plan. One week later, at Goldman's request, Strom submitted a Statement of Health.

In February and March 1994, Strom worked in Goldman's Hong Kong office. While he was abroad, Goldman, as administrator of the Plan, sent memoranda addressed to Strom to his New York office. The memoranda incorrectly stated that Strom neither had requested the optional $1 million in life insurance coverage under

* The Honorable Charles L. Brieant, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

** The Honorable Lewis A. Kaplan, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

*** Pursuant to 28 U.S.C. § 46(b) and an order of the chief judge of this Court certifying a judicial emergency, this case was heard by an emergency panel consisting of one judge from this court and two judges of the United States District Court sitting by designation.

1. The defendants submitted copies of the group life insurance policy, the summary description of the supplemental life insurance plan, a number of documents that allegedly passed between Strom and Goldman or its insurance carrier, and a letter from the carrier to plaintiff's counsel in support of their Rule 12(b)(6) motion. The court below explicitly and correctly considered the group policy on the theory that it had been incorporated by reference in the complaint. *See, e.g., Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993). There is no indication that it converted the motion to dismiss into a motion for summary judgment pursuant to FED.R.CIV.P. 12(b), which ordinarily would be inappropriate absent notice to the parties, which was not given here. *See Kopec v. Coughlin,* 922 F.2d 152, 154–55 (2d Cir.1991). Accordingly, in deciding this appeal, we disregard all of the materials outside the pleadings except the group life insurance policy. *See Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir.1999).

the Plan nor submitted a Statement of Health.

Strom returned to his New York office in early April 1994 and found the memoranda. He thereupon resubmitted the forms that Goldman claimed were missing, again electing the full $1 million in additional coverage.

On June 17, 1994, Strom received a letter from MetLife, Goldman's insurance carrier, stating that it had received his request for the additional insurance but that an Attending Physician Statement was missing from the application. Strom timely submitted the form, receipt of which was confirmed by MetLife on July 20, 1994. On August 13, 1994, MetLife informed Strom that his application for the added coverage had been approved and would become effective on September 1, 1994. The determination of the effective date apparently was made by reference to the group life policy, which provided in substance that coverage would become effective on the first day of the month following the later of the first day of employment and the approval of the request for coverage.

On August 28, 1994, just four days before the effective date of the MetLife coverage under the Plan, Strom died suddenly of a massive pulmonary embolism. Plaintiff was paid the $150,000 in basic life insurance benefits. Defendants, however, paid only $500,000 with respect to the supplemental coverage purchased under the Plan. Although the record properly before us does not conclusively establish the reason for this distinction, it appears that the carrier took the position, well founded in the group life policy, that the guaranteed issue portion of the coverage became effective before Strom died, but that the remaining $500,000 of the death benefit did not become effective prior to his demise.[2]

Strom's widow commenced this action in September 1996 under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, principally to recover the $500,000 in additional insurance benefits that she claims she is owed. The first claim simply stated that "[d]efendants have violated ERISA by refusing to pay plaintiff the full $1,000,000 supplemental life insurance benefit to which she is entitled under the terms of the . . . Plan." The second alleged that Goldman breached its fiduciary duty, that defendants were "estopped from asserting that Strom failed to enroll in the Supplemental Plan, and [that] equitable relief is appropriate to put plaintiff in the position she would have been in but for Goldman's breach."

The district court granted defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6). It began by construing the first claim as asserting that plaintiff was entitled to the claimed benefit under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), on the theory that the benefit was due and payable under the terms of the Plan.[3] The court, however, rejected the argument on the ground that the Plan explicitly made coverage effective on "the first day of the month after . . . the insurance company approves [the] application." It noted also, in the alternative, that any benefits that might be owed would be payable only by MetLife, not the defendants.

---

**2.** A letter from the carrier to plaintiff's attorney which was submitted to the district court but which is not properly considered by us, *see supra* note 1, asserted that the second $500,000 tranche of coverage for which Strom had applied was group universal life insurance rather than the supplemental group life. It relied on Strom's death prior to September 1, 1994 as the sole basis for rejection of the claim for the second tranche. Hence, nothing turns on whether the incremental $500,000 in coverage was supplemental group life or group universal life.

**3.** As the complaint alleges solely claims under ERISA, presumably on the theory that any state law-based claims would be preempted, we have no occasion to address the preemption issue. *See Mertens v. Hewitt Associates,* 508 U.S. 248, 261–62, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

The district court began its analysis of the second claim by adverting to the fact that Section 502(a)(3)(B) of ERISA, 29 U.S.C. § 1132(a)(3)(B), insofar as it is relevant here, permits suit by a beneficiary only to obtain "other appropriate equitable relief." It then characterized this claim as seeking damages from Goldman for its alleged failure to act appropriately in having Strom's coverage become effective at the earliest date possible. Reasoning that the damages sought by plaintiff were legal in nature and could not be characterized as restitution, an equitable remedy, in the absence of a claim that Goldman was enriched unjustly, it concluded that ERISA does not permit recovery in these circumstances. It therefore dismissed the second claim as well. Plaintiff appeals.

## II

■■■ The district court correctly dismissed the first claim. Section 502(a)(1)(B) of ERISA provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits *due to him under the terms of his plan . . .*" 29 U.S.C. § 1132(a)(1)(B) (emphasis added). A claim under this section, in essence, is the assertion of a contractual right under a benefit plan. *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1133 (7th Cir.1992). In consequence, to enforce the terms of the plan under Section 1132(a)(1)(B) "the participant must first qualify for the benefits provided in that plan." *Id.* at 1134. As Strom never qualified for the supplemental insurance coverage because he died before the first day of the month following the carrier's approval of his application, there is no benefit due under the Plan. *See, e.g., Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (no remedy under Section 502(a)(1)(B) where plaintiffs no longer members of plan).

Plaintiff resists this conclusion, arguing that the defendants are precluded from relying upon the failure of Strom's coverage to have taken effect before his death on the ground that the failure was the product of Goldman's own actions. She invokes the familiar principle that a party may not rely upon the failure to satisfy a contractual condition where the party itself has caused the failure. But the argument is misguided here.

The doctrine upon which plaintiff relies holds that satisfaction of a condition is excused when a promissor wrongfully prevents its satisfaction. *E.g., Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 501 (2d Cir.1989); *Spanos v. Skouras Theatres Corp.,* 364 F.2d 161, 169 (2d Cir.) (in banc), *cert. denied,* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966). Here, however, MetLife, the insurance carrier, not Goldman, was both the promissor on the insurance contract and the entity that invoked the failure to satisfy the condition in order to excuse performance. Hence, even if, as plaintiff alleges, Goldman wrongfully prevented satisfaction of the condition to the effectiveness of Strom's incremental coverage, it is not Goldman which seeks to benefit from its own actions, but a third party.

No doubt recognizing the difficulty with her position, plaintiff now seeks to impute Goldman's nonperformance to MetLife on a theory of agency. She argues that Goldman was MetLife's agent because the Plan designated Goldman to receive insurance applications and to submit them to MetLife. Appt's Reply Br. 4 n. 3. But the argument is of no avail.

To begin with, this argument emerged for the first time in plaintiff's reply brief, affording defendant no opportunity to respond. We repeatedly have said that we will not consider contentions first advanced at such a late stage. *E.g., Ernst Haas Studio, Inc. v. Palm Press, Inc.,* 164 F.3d 110, 112 (2d Cir.1999); *Playboy Enterprises, Inc. v. Dumas,* 159 F.3d 1347 (2d Cir. 1998), *aff'g* 960 F.Supp. 710, 720–21 n. 7 (S.D.N.Y.1997); *Keefe v. Shalala,* 71 F.3d 1060, 1066 n. 2 (2d Cir.1995); *Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir.1993), *cert. denied,* 513 U.S. 963, 115 S.Ct. 424,

130 L.Ed.2d 338 (1994); *NLRB v. Star Color Plate Service,* 843 F.2d 1507, 1510 n. 3 (2d Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988).

In any case, the argument is without merit. The complaint alleges no facts from which one might conclude that Goldman acted as agent for MetLife. To the contrary, Goldman and MetLife each performed separate functions with respect to the Plan—Goldman as administrator, MetLife as insurer. Goldman did not become MetLife's agent simply because their roles were related.[4]

### III

■ Plaintiff's claim against Goldman, in material part, seeks only recovery of the $500,000 that she would have received had Goldman's alleged breach of fiduciary duty[5] not resulted in her husband's group life insurance failing to become effective before his death. There is no claim for punitive or consequential damages, emotional distress, or any of the other elements typically associated with tort claims. In other words, she seeks only to be made whole for the loss of the benefit that otherwise would have been paid to her under the plan.

As noted above, the district court characterized this claim as seeking money damages, a traditional legal remedy. Relying principally on our decision in *Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18 (2d Cir.1996), it rejected plaintiff's contention that the recovery of the amount of the lost insurance benefit would be restitutionary, and therefore equitable rather than legal, on the ground that restitution is

available only where a defendant has been enriched unjustly by the action complained of, a circumstance absent in this case. It therefore dismissed the claim against Goldman on the ground that Section 502(a)(3)(B) of ERISA, 29 U.S.C. § 1132(a)(3)(B), in relevant part, permits recovery only of "appropriate equitable relief," not damages.

The district court's reliance on *Geller* was misplaced. The critical fact that distinguishes *Geller* from this case is that this is an action against an alleged fiduciary whereas *Geller* involved a suit by a fiduciary against nonfiduciary wrongdoers. And that distinction is material.

*Geller* was an appeal from the dismissal of a complaint brought by trustees of an employee benefit plan to recover from nonfiduciaries the amount of benefits paid by the trustees to an ineligible person by reason of the defendants' alleged fraud. In a colloquial sense, they sought restitution. But it is important to understand the basis of equitable relief in fraud cases.

■ Relief against fraud long has been available at law and, in appropriate circumstances, in equity. *See, e.g.,* 1 JOHN NORTON POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 188 (5th ed.1941) (hereinafter POMEROY); V WILLIAM F. FRATCHER, SCOTT ON TRUSTS § 462.3, at 321–22 (4th ed.1989) (hereinafter SCOTT ON TRUSTS); 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 260 (14th ed.1918) (hereinafter STORY); RESTATEMENT, RESTITUTION § 166 (1937). The legal remedies are actions in tort or quasi-contract for damages. The common equitable remedy is the imposition of a constructive trust, for the

---

**4.** In view of our holding that no additional benefits were payable under the Plan, there is no need for extensive consideration of plaintiff's contention that the district court erred in failing to permit it to amend the complaint to add MetLife as a defendant. Any such amendment plainly would have been futile.

**5.** Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), requires ERISA fiduciaries to discharge their duties "with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." As Goldman does not contend that the complaint does not allege facts which, if proved, would amount to a violation of this provision, we express no opinion on that point.

purpose of preventing unjust enrichment and protecting the victim, on property wrongfully held by the wrongdoer. *E.g.,* 1 POMEROY § 155, at 210; RESTATEMENT, RESTITUTION §§ 160 & cmts. *d, e,* 166. The theory of the equitable remedy is the fiction that the wrongdoer holds the victim's property in trust for the victim. In consequence, restitution, as we said in *Geller,* is available only if the wrongdoer would be enriched unjustly by the retention of the property that is the subject of the implied or constructive trust.[6] *Cherno v. Dutch American Mercantile Corp.,* 353 F.2d 147, 153 (2d Cir.1965); RESTATEMENT, RESTITUTION § 160 *cmts.* c, d. But it is important not to lose sight of the fact that the constructive "trusts" that underly the remedy of restitution "are not really trusts, but are merely the means by which a court redresses a wrong or prevents unjust enrichment, by compelling one who holds title to property to convey it to another." I SCOTT ON TRUSTS § 17, at 243. "[A] constructive trust, unlike an express trust, is not based upon a fiduciary relationship." *Cherno,* 353 F.2d at 153.

■ This case has a quite different basis. Here, the gravamen of the claim against Goldman is not that it holds property which in equity and good conscience belongs to the plaintiff and which must be surrendered to avoid unjust enrichment. Rather, the claim is that Goldman was a fiduciary within the meaning of ERISA and that it breached its fiduciary duty.[7] Its analog is the conventional action by a *cestui que trust* against a trustee for breach of trust.

Claims of this sort do not depend upon the fiction of constructive trusts but on the positive duties of loyalty and prudence owed by fiduciaries to their beneficiaries.[8] They have lain at the heart of equitable jurisdiction from time immemorial. Indeed, a trust beneficiary had no remedy at law whatever against the trustee for breach of duty. The beneficiary's remedy lay—and, in the few states such as Delaware in which law and equity have not been merged, still lies—exclusively in equity. *E.g., Harry and Jeanette Weinberg Foundation, Inc. v. ANB Investment Management and Trust Co.,* No. 97 C 4362, 1997 WL 652342, *4 (N.D.Ill. Oct.10, 1997); In re Lloyd's American Trust Fund Litig.,* 954 F.Supp. 656, 681 (S.D.N.Y.1997); *Harman v. Masoneilan Int'l, Inc.,* 442 A.2d 487, 497–99 (Del.Sup. 1982); *Kysor Industrial Corp. v. Margaux, Inc.,* 674 A.2d 889, 897 (Del.Super.1996); *Husted v. Thomson,* 158 N.Y. 328, 337, 53 N.E. 20 (1899); *Durham v. Perkins,* 270 A.D. 739, 744, 62 N.Y.S.2d 205, 209 (1st Dept.), *aff'd,* 296 N.Y. 514, 68 N.E.2d 454 (1946); *Hoffman v. Nagler,* 206 Misc. 623, 626, 134 N.Y.S.2d 335, 337–38 (Mun.Ct.1954); 1 POMEROY § 151, at 206; III SCOTT ON TRUSTS §§ 197–197.2; STORY §§ 1300–03; RESTATEMENT (SECOND) OF TRUSTS § 197 (1959).

These considerations demonstrate that *Geller* has no bearing in this case. *Geller* quite correctly held that the damages the plaintiffs there sought against the nonfiduciary defendants were unavailable because there was no unjust enrichment, which was

6. Moreover, equity typically denied relief in a proceeding seeking restitution—an action to impress a constructive trust on the property—on the theory of unjust enrichment because the remedy at law, an action for damages, typically was adequate. RESTATEMENT, RESTITUTION § 160, *cmt. e.* Indeed, relief usually was denied in equity in cases of fraud precisely because the legal remedy of an action at law for common law fraud ordinarily was adequate. V SCOTT ON TRUSTS § 462.3, at 321.

7. The creation of trust relationships by statute is not unique to ERISA. I SCOTT ON TRUSTS

§ 17.5, at 242; *see also, e.g., Connors v. Gallick,* 4 Ohio Misc. 163, 339 F.2d 381, 385 (6th Cir.1964) (plaintiff in wrongful death action under FELA is statutory trustee for beneficiaries); *Friedman v. McHugh,* 168 F.2d 350, 352 (1st Cir.1948) (same).

8. *See, e.g.,* 1 POMEROY §§ 97, 150a (5th ed.1941) (noting that (a) equitable jurisdiction consists both of rules creating primary rights and duties and remedies unique to equity courts and (b) the law of trusts is within the former category).

an essential element of the only conceivable equitable claim, a claim for restitution based on a constructive trust theory. Here, however, the plaintiff's claim is based on the alleged breach of a fiduciary duty, a claim that always has been within the exclusive jurisdiction of equity [9] and that never has required a showing of unjust enrichment because the theory of the action is entirely different. The absence of unjust enrichment here therefore is not inconsistent with accurate characterization of the relief plaintiff seeks as "equitable."

The fact that Strom's claim against Goldman falls within the exclusive jurisdiction of equity, as traditionally understood, is not the end of the analysis. As the Supreme Court has made clear, our task is not simply to ascertain the "correct" historical classification of this aspect of the complaint, but to determine whether Congress' use of the phrase "equitable relief" was intended to comprehend the relief sought from Goldman. *Mertens v. Hewitt Associates*, 508 U.S. 248, 256–57, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). There are ample additional signposts to guide us in doing so.

It is helpful, at the outset, to bear in mind the ambitious goals of ERISA. Faced with a patchwork of varying state law governing the rights and responsibilities of pension plans, fiduciaries, beneficiaries and participants, Congress sought to establish minimum standards of fiduciary conduct, to improve the equitable character and soundness of private pension plans, and to provide "for appropriate remedies ... and ready access to the Federal courts." 29 U.S.C. § 1001(b); *see also Varity Corp.*, 516 U.S. at 513, 116 S.Ct. 1065. The House Education and Labor and the Senate Labor and Public Welfare Committees elaborated on the aims of the statute's remedial provisions in virtually identical language:

"The enforcement provisions have been designed specifically to provide both the Secretary [of Labor] and participants and beneficiaries with broad remedies for redressing or preventing violations of the Act. The intent of the Committee is to provide the full range of legal and equitable remedies available in both state and federal courts and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law for recovery of benefits due to participants." H.R.REP. No. 93–533, 93d Cong., 2d Sess., *reprinted in* 3 U.S.C.C.A.N. 4639, 4655 (1974); S.REP. No. 93–127, 93d Cong., 2d Sess., *reprinted in* 3 U.S.C.C.A.N. 4838, 4871 (1974). *See also Varity Corp.*, 516 U.S. at 512, 116 S.Ct. 1065.

■ Legislative committee reports, of course, may not be used as an excuse for ignoring statutory text. *See Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 621–22, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (Scalia, J., concurring); *see also Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Moreover, the reference in the committee reports to both legal and equitable remedies, in juxtaposition with the reference in Section 502(a)(3)(B) only to equitable relief, tends to confirm that Section 502(a)(3)(B) does not permit suits for legal relief, whatever Congress meant by that term. Nevertheless, these statements of purpose do support the view that the creation of an adequate and, indeed, improved remedial scheme for the benefit of participants and beneficiaries was an important goal. Moreover, there is far more direct evidence of the types of remedies that Congress regarded as equitable when it enacted ERISA, for the statute was not created in a vacuum. It was enacted in a

---

**9.** The exclusive jurisdiction of equity "extends to and embraces ... all civil cases in which the primary right violated or to be declared, maintained, or enforced ... is purely equitable, and not legal, a right, estate, title or interest created by equity, and not by law." 1 POMEROY § 137.

context of preexisting employment-related statutes, such as the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 1 *et seq.*, and Title VII of the Civil Rights Act of 1964 (the "CRA"), now codified at 42 U.S.C. § 2000e *et seq.*, that are highly pertinent in one important respect in that they embodied a similar concept.

Among the remedial provisions of the NLRA that was adapted and carried over into the CRA was the availability to an employee victimized by an unlawful employment practice of an award of back pay, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), a remedy considerably more limited than traditional tort measures that might have been provided. As the Court wrote in *United States v. Burke*, 504 U.S. 229, 239, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992):

> "The Court previously has observed that Title VII focuses on 'legal injuries of an economic character,' see Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), consisting specifically of the unlawful deprivation of full wages earned or due for services performed, or the unlawful deprivation of the opportunity to earn wages through wrongful termination. The remedy, correspondingly, consists of restoring victims, through backpay awards and injunctive relief, to the wage and employment positions they would have occupied absent the unlawful discrimination. [citations omitted] Nothing in this remedial scheme purports to recompense a Title VII plaintiff for any of the other traditional harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages (e.g., a ruined credit rating)."

In other words, in contrast to more traditional tort remedies, the back pay award is intended only to compensate a victim of employment discrimination for the direct economic consequences of the employer's violation of the CRA.

The back pay remedy in the CRA found its original expression in Section 706, which empowered a court finding a respondent guilty of an unlawful employment practice to "enjoin the respondent from engaging in such ... practice, and order such affirmative action as may be appropriate, which may include ... back pay ..." 78 Stat. 241, 261. There was no reference to equitable relief. Congress, however, added that term in 1972, two years prior to the enactment of ERISA, when it passed the Equal Employment Opportunity Act of 1972, 86 Stat. 103 (the "EEOA"). Section 4(a) of that statute amended Section 706 to read, in pertinent part, that a court finding a respondent guilty of an unlawful employment practice "may enjoin the respondent from engaging in such ... practice, and order such affirmative action as may be appropriate, which may include ... back pay, ... *or any other equitable relief as the court deems appropriate.*" 86 Stat. 107, *now codified at* 42 U.S.C. § 2000e–5(g)(1) (emphasis added).

The addition of the italicized phrase was significant. To begin with, the "meaning of a word [or phrase] cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 694, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). Hence, the phrase "other appropriate equitable relief" cannot properly be construed without regard to the fact that it appears immediately following the reference to the back pay remedy.

The position of the phrase "or any other equitable relief" in the sentence in which it appears indicates that it modifies one or both of the two specific remedies referred to just before it in the same sentence in Section 706(g)(1)—injunctions and affirmative action including back pay. *Cf., e.g., Elliot Coal Mining Co. v. Director, Office of Workers' Compensation Programs*, 17

F.3d 616, 629–30 (3d Cir.1994) (qualifying clause in statute is applied to the immediately preceding phrase). Its addition therefore had two consequences relevant here. First, under the principles of *noscitur a sociis* and *ejusdem generis,* it limited the affirmative action available under the CRA to "equitable relief." *See Norfolk & Western R. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (*ejusdem generis*); *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (*noscitur a sociis*). Second, the use of the word "other" immediately after the reference to back pay and before "equitable relief" demonstrated Congress' understanding that the back pay remedy is equitable in nature. *See Chauffeurs, Teamsters and Helpers, Local 391 v. Terry,* 494 U.S. 558, 572, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); *Albemarle Paper Co.,* 422 U.S. at 415–418, 95 S.Ct. 2362.

This view, moreover, is confirmed by the Supreme Court's treatment of the right to a jury trial on a back pay claim under the CRA and by the temporal relationship of one of its rulings to the enactment of ERISA. The Supreme Court first commented on the jury trial issue in *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), which was decided seven months before the enactment of ERISA. In the course of holding that the Seventh Amendment guaranteed the right to a jury in actions under Section 812 of the Civil Rights Act of 1968, 42 U.S.C. § 3612, the Court carefully distinguished suits for back pay under Section 706(g) of the CRA, noting that "the courts of appeals [had] characterized back pay as an integral part of an equitable remedy, a form of restitution," in Title VII cases. *Id.* at 197, 94 S.Ct. 1005.

In sum, then, the enactment of Section 502(a)(3)(B) did not occur in isolation. It came in the wake of Congress' own 1972 characterization of back pay as an equitable remedy by its enactment of the EEOA and of the Supreme Court's 1974 acknowledgment that this type of relief had been held by courts of appeals to be "an integral part of an equitable remedy, a form of restitution."

When Congress enacts a statute, it is deemed to know of its prior actions, particularly where the subject matter of the statutes in question is related, as is the case here. *See Traynor v. Turnage,* 485 U.S. 535, 546, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988); *Cannon v. University of Chicago,* 441 U.S. 677, 696–98, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Hence, it must be regarded as having intended that its use of the phrase "other appropriate equitable relief" in ERISA be given the same meaning as the virtually identical language—"any other equitable relief as the court deems appropriate"—that it used in the CRA, as amended. Congress is presumed also to be aware of prior judicial interpretations of similar statutory provisions. *E.g., Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); *Fluor Corp. v. United States,* 126 F.3d 1397, 1404 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1118, 118 S.Ct. 1057, 140 L.Ed.2d 119 (1998). Congress therefore is presumed to have known of *Curtis'* characterization of back pay as an equitable remedy when it passed ERISA seven months after that case was decided.

The relief sought in this case is indistinguishable from back pay in any material respect. Like a back pay award, its objective is to eliminate the direct economic effect of an alleged violation of the statute. *See Albemarle,* 422 U.S. at 418, 95 S.Ct. 2362. It includes none of the other subjects of compensation found in traditional tort actions. It is, in the words of the Supreme Court, simply a "make whole" remedy. *Id.* at 419, 95 S.Ct. 2362. This strongly supports plaintiff's contention that the relief sought here is "equitable"

within the meaning of Section 502(a)(3)(B) of ERISA.

*Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161, the case principally relied upon by Goldman, is not to the contrary. The plaintiffs in that case sued a plan's actuary, a nonfiduciary, for damages on the theory that the actuary had assisted the employer in breaching its duties to the plan. The Supreme Court first assumed, *arguendo* and *dubitante,* that the statute imposed a duty on the actuary notwithstanding its nonfiduciary status, but then stated that the relief sought was "nothing other than compensatory damages" which were not available under Section 503(a)(3), particularly in light of the holding in *Burke,* 504 U.S. 229, 112 S.Ct. 1867, 119 L.Ed.2d 34, that "awards for compensatory or punitive damages" are precluded under Section 706(g)(1) of the CRA. *Mertens,* 508 U.S. at 255, 113 S.Ct. 2063. It went on to assert that its holding that the actuary was not subject to suit under ERISA did not interfere with Congress' goal of protecting participants and beneficiaries because adequate remedies existed against plan fiduciaries, and its holding did no more than "eliminate[ ] . . . joint and several liability, for all direct and consequential damages suffered by the plan, on the part of persons who had no real power to control what the plan did." *Id.* at 262, 113 S.Ct. 2063.

Goldman argues that *Mertens'* comment that the relief sought by the plaintiffs in that case was "nothing other than compensatory damages" demonstrates that the remedy sought here is not equitable in nature. But that conclusion would follow only if *Mertens* were read in an unduly expansive and, in our view, unintended manner.

*Mertens,* to begin with, dealt with an action against a nonfiduciary under a statute that appears to reflect a deliberate decision not to create remedies against nonfiduciaries. *Id.* at 253–54, 113 S.Ct. 2063. A reading of Section 502(a)(3)(B) that would permit relief against a nonfiduciary under that provision when nonfiduciaries were excluded elsewhere in the remedial sections would tend to undermine the framework that Congress adopted. Further, *Mertens* did not overrule *Burke,* which carefully distinguished between a pure "make whole" remedy like back pay or the remedy sought here, and claims for consequential and other more generous measures of injury. Indeed, it relied upon it. *Id.* at 255, 112 S.Ct. 1867. Nor did *Mertens* overrule *Curtis* and its progeny, which support the view that such a "make whole" remedy is equitable. Finally, this case is quite different from *Mertens* in another salient respect. Here, in stark contrast to *Mertens,* the claim is against an alleged plan fiduciary which controlled whether plaintiff's late husband would be covered by the plan, not a nonfiduciary that has been hauled into court to add another deep pocket to a list of defendants more directly responsible for an alleged breach of duty. This too has a bearing.

In *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130, the plaintiff classes claimed that their former employer and plan fiduciary breached its duties by tricking them into withdrawing from their old plan, shifting to a new employer, and accepting coverage by a plan which the defendant knew to be insolvent. The Supreme Court held that the plaintiff classes were entitled to sue the former employer under Section 502(a)(3)—notwithstanding that they clearly did not meet the requirements of any of the other subsections of that provision—on the theory that Section 502(a)(3) "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations [of ERISA] that § 502 does not elsewhere adequately remedy." *Id.* at 512, 116 S.Ct. 1065. It wrote:

> "[T]he statute authorizes 'appropriate' equitable relief. We should expect that courts, in fashioning 'appropriate' equitable relief, will keep in mind the 'special nature and purpose of employee benefit

plans,' and will respect the 'policy choices reflected in the inclusion of certain remedies and the exclusion of others.'" *Pilot Life Ins. Co.,* 481 U.S., at 54 [107 S.Ct. 1549]. See also *Russell,* 473 U.S., at 147 [105 S.Ct. 3085]; Mertens, 508 U.S. at 263–264 [113 S.Ct. 2063]. Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate." Cf. *Russell, supra,* at 144 [105 S.Ct. 3085].

"But that is not the case here. The plaintiffs in this case could not proceed under the first subsection [of Section 502(a)] because they were no longer members of the . . . plan and, therefore, had no 'benefits due [them] under the terms of [the] plan.' § 502(a)(1)(B). They could not proceed under the second subsection because that provision, tied to § 409, does not provide a remedy for individual beneficiaries. Russell, supra, at 144 [105 S.Ct. 3085]. They must rely on the third subsection or they have no remedy at all. *We are not aware of any ERISA-related purpose that denial of a remedy would serve. Rather, we believe that granting a remedy is consistent with the literal language of the statute, the Act's purposes, and pre-existing trust law." Id.* at 515, 116 S.Ct. 1065 (emphasis added).

So too here. Plaintiff cannot sue under Section 502(a)(1)(B) because there are no benefits due her under the plan. She cannot proceed under Section 502(a)(2) because it affords no remedies to individual beneficiaries. We are aware of no ERISA-related purpose that would be served by denying her any remedy at all, assuming that she can prove the allegations of the complaint. Allowing her to recover the benefit that she would have

received absent the alleged breach of duty, but not consequential or other damages, would be entirely consistent with Congress' and the Court's characterization of the "make whole" remedy of back pay as equitable in character notwithstanding the fact that an employer who engages in unlawful employment discrimination ordinarily is not enriched thereby.[10] Hence, granting this remedy would be consistent with the language and purposes of the statute.

We recognize of course that *Varity Corp.* spoke only in terms of the availability of equitable relief under Section 502(a)(3)(B) where the beneficiary has no other remedy available and therefore does not directly address the question whether the "make whole" relief sought here comes within that language. But it evidences a clear intention to avoid construing ERISA in a manner that would leave beneficiaries such as the plaintiff here without any remedy at all. Moreover, both the Third and Eighth Circuits have held that "make whole" relief is "equitable" and, where no other remedy is available, "appropriate."

In *Ream v. Frey,* 107 F.3d 147 (3d Cir. 1997), the plan trustee resigned and conveyed the plan assets to the plan administrator, who first became insolvent and then absconded. The plaintiff, a plan beneficiary, sued the former trustee to recover his vested interest in the plan. Acknowledging that the plaintiff, as a beneficiary, could not sue the former trustee under Section 502(a)(2) because that provision does not permit individual suits, it nevertheless held, on the authority of *Varity Corp.,* that the plaintiff was entitled to seek "appropriate equitable relief" under Section 502(a)(3)(B) given the absence of any other recourse. Moreover, it went on to answer the question that was not raised in *Varity Corp.,* indicating that the limited "make whole" relief that plaintiff sought

---

**10.** Typically, the employer simply pays the salary that otherwise would have been paid to the discrimination victim to a non-minority employee. Its net economic position is unchanged.

**150**

was "equitable" and therefore available under that section notwithstanding *Mertens:*

> " 'Appropriate equitable relief' generally is limited to traditional equitable relief such as restitution and injunctions rather than money damages. *Hein v. FDIC,* 88 F.3d 210, 223–24 & n. 11 (3d Cir. 1996)[, *cert. denied sub nom. Hein v. McNeil,* 519 U.S. 1056, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997) ]. However, ERISA § 502(a)(3) does not 'necessarily bar all forms of money damages.' *Id.* at 224, n. 11. Here, though the district court seemed to treat Ream's complaint as one seeking money damages, Ream sought only to recover his vested interest in the plan which largely reflected his own contributions. [citation omitted] This relief, regardless of the language in the complaint, easily may be characterized as restitution and the [former trustee] does not contend otherwise." *Id.* at 153 n. 5.

The Eighth Circuit reached substantially the same result in *Varity Corp.* itself. *Howe v. Varity Corp.,* 36 F.3d 746 (8th Cir.1994), *aff'd,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). It reversed a damage award of more than $8 million on the basis of *Mertens,* but went on to hold that plaintiffs and the class members were entitled to receive the benefits of which they had been deprived, relief which it characterized as restitution. *Id.* at 756.

In sum, all of the relevant circumstances point to one conclusion. Actions for breach of trust historically were within the exclusive jurisdiction of equity. Congress appears to regard "make whole" relief such as that sought here as "equitable." Only such a construction would serve Congress' purpose of affording meaningful relief to benefit plan beneficiaries in circumstances such as these. We therefore hold that the relief sought here is "equitable relief" within the meaning of Section 502(a)(3)(B) and that such relief would be "appropriate" in the event plaintiff establishes liability on the part of Goldman.

Accordingly, the dismissal of the complaint as against Goldman must be reversed.

### IV

For the foregoing reasons, the judgment appealed from is affirmed insofar as it dismissed the complaint against the Plan. It is reversed insofar as it dismissed the complaint against Goldman. The case is remanded for further proceedings consistent with this opinion.