445 F.3d 572
 Abraham WILKINS, Plaintiff-Appellant,
v.
MASON TENDERS DISTRICT COUNCIL PENSION FUND and the Trustees of the Mason Tenders District Council Pension Fund, Defendant-Appellee.
Docket No. 05-2303 CV.
 United States Court of Appeals, Second Circuit.
 Argued: December 12, 2005.
 Decided: April 21, 2006.
 
 COPYRIGHT MATERIAL OMITTED Robert J. Bach, New York, N.Y., for Plaintiff-Appellant.
 Myron D. Rumeld, Proskauer Rose LLP (Russell L. Hirschhorn, on the brief), New York, N.Y., for Defendant-Appellee.
 Before: CALABRESI, KATZMANN, and HALL, Circuit Judges.
 CALABRESI, Circuit Judge.
 
 
 1
 Plaintiff-Appellant Abraham Wilkins worked in the construction industry over the course of four decades, and claims that because some of his employers underreported his earnings to his pension fund, he has not received all the retirement benefits to which that work entitled him. Wilkins argues, among other things, that it is the obligation of his pension fund, Defendant-Appellee Mason Tenders District Council Pension Fund, and its Board of Trustees (collectively, "the Fund"), to ensure, through audits or other means, that his employers submitted accurate records of his earnings. Further, he argues that the Fund's policy of requiring claimants to prove their entitlement to additional benefits when employers underreport (the "Policy") shifts its record-keeping duty to him in violation of the Fund's fiduciary duty under the Employee Retirement Income and Security Act (ERISA) of 1974, 29 U.S.C. § 1001 et seq. He also contends that the Fund's failure to publish this Policy in its Summary Plan Description ("SPD") violates ERISA.
 
 
 2
 We do not agree with Wilkins that the Fund violated its fiduciary duties when it failed to audit his employers during the years in question. We also find that ERISA does not prevent the Fund from requiring Wilkins to produce some proof that he performed work for which he did not receive credit before it awards him additional benefits. We do agree with Wilkins, however, that if the Fund intends plan participants to shoulder the burden of producing such proof, ERISA requires that notice to this effect be given to plan participants in the Fund's SPD. The Fund did not do so here, and we remand for a determination of whether Wilkins was prejudiced by this omission, and if he was, for a determination of the amount of benefits he is due.
 
 
 3
 * A. Structure of the Fund and Wilkins's Employment History
 
 
 4
 The Fund, which is administered by the Mason Tenders District Council ("the District Council"), a labor organization, provides retirement benefits for members of Mason Tenders locals. Participants' pensions are funded through contributions by their employers. See 29 U.S.C. § 1002(37)(A). These employers, more than 2000 in number, are required by their collective bargaining agreements ("CBAs") with the District Council to contribute to the Fund based on their employees' "covered employment" — that is, based on work performed by the employees under an employer's contract with the union. The Fund's own records of union members' earnings in covered employment are derived principally from remittance reports submitted, along with contributions, by the employers.
 
 
 5
 As required by ERISA, the terms of the pension program are governed by a written plan. See 29 U.S.C. § 1102(a)(1). Under the terms of plan, the Fund pays benefits to its participants on the basis of the number of "pension credits" their covered employment qualifies them for. For work performed prior to 1967, one credit is earned for each $750.00 of gross wages of covered employment during a calendar year, and for work performed in and after 1967, one credit is earned for every 150 hours of covered employment in a calendar year. The Fund does not count fractional credits: that is, on the pre-1967 scale, a worker receives one credit for earnings from $750.00 to $1499.00, and two credits for earnings from $1500.00 through $2249.00.
 
 
 6
 Abraham Wilkins worked in the construction industry from the 1950s until the 1980s and belonged to a Mason Tenders Local, Construction & General Building Laborers' Local 47, during that time. Over the years, he worked for fourteen employers, including seven who had CBAs with the District Council. Between them, these seven employers made some contributions to the Fund on Wilkins's behalf for eleven years: 1956, 1957, 1958, 1959, 1960, 1961, 1962, 1963, 1964, 1965, and 1985. Wilkins was a member of at least three other unions, some of which had their own CBAs with some of these seven employers.
 
 
 7
 As the Supreme Court noted in Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, 472 U.S. 559, 566-67, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985), when a pension fund relies on employer self-reporting to determine employers' liability to the fund, employers have an incentive to underreport. Funds can police the reporting practices of contributing employers through random audits, see id. at 570-71, 105 S.Ct. 2833, and the Fund does this, see Wilkins v. Mason Tenders' Dist. Council, No. 03-cv-1581, 2005 WL 783064, at *3, 2005 U.S. Dist. LEXIS 5845, at *13 (E.D.N.Y. Apr. 7, 2005). Still, random audits do not guarantee accurate reporting. In Wilkins's case, as the table below illustrates, there are significant variances between the earnings some of these seven employers reported to the Fund and the earnings they reported to the Social Security Administration ("SSA").
 
 
 8
 ----------------------------------------------------------------------
 Earnings Reported Earnings Reported
 Year Employer to the Fund to the SSA
----------------------------------------------------------------------
 1956 Arfal Foundations $ 936.34 $ 1,360.27
----------------------------------------------------------------------
 1956 Ralph Amore $ 292.50 $ 639.00
----------------------------------------------------------------------
 1956 Well-Mixed Concrete Co. $ 199.00 $ 1,609.00
----------------------------------------------------------------------
 1957 Well-Mixed Concrete Co. $ 326.55 $ 3,502.78
----------------------------------------------------------------------
 1957 Anthony Cutrupi $ 102.00 $ 102.00
----------------------------------------------------------------------
 1957 Concrete Plank Co. $ 84.00 $ 84.00
----------------------------------------------------------------------
 1957 Caristo Constr. Corp. $ 157.20 $ 157.20
----------------------------------------------------------------------
 1958 Well-Mixed Concrete Co. $ 417.29 $ 4,200.00
----------------------------------------------------------------------
 
 
 9
 ----------------------------------------------------------------------
 1959 Well-Mixed Concrete Co. $ 324.30 $ 4,800.00
----------------------------------------------------------------------
 1960 Well-Mixed Concrete Co. $ 386.90 $ 4,799.60
----------------------------------------------------------------------
 1961 Well-Mixed Concrete Co. $ 109.20 $ 4,800.00
----------------------------------------------------------------------
 1962 Well-Mixed Concrete Co. $1,146.00 $ 4,800.00
----------------------------------------------------------------------
 1963 Well-Mixed Concrete Co. $ 766.35 $ 4,800.00
----------------------------------------------------------------------
 1964 Well-Mixed Concrete Co. $ 239.50 $ 4,800.00
----------------------------------------------------------------------
 1965 Well-Mixed Concrete Co. $ 980.00 $ 4,800.00
----------------------------------------------------------------------
 1985 Alicer Contracting Co. $ 0.00 $14,030.69
----------------------------------------------------------------------
 
 
 10
 Not all of the shortfall between the third and fourth columns necessarily represents underreporting on the part of Wilkins's employers, however. Employers were only obligated to report Wilkins's earnings for covered employment — that is, for work performed in his capacity as a member of the Mason Tenders. And, as mentioned above, Wilkins was a member of three unions besides the Mason Tenders Local during the relevant period. The record shows that at least two of these employers — Well-Mixed Concrete and Alicer Contracting — also had CBAs with other unions to which Wilkins belonged. As a result, some or all of the discrepancy between earnings reported to the Fund and to the SSA by these employers (and any others with ties to Wilkins's other unions) could represent work that Wilkins performed for other unions.
 
 B. Procedural Background
 
 11
 Wilkins filed an application for pension benefits in 1998. In 1999, the Fund paid him a lump sum benefit of $429.21, which was based on pension credits earned in 1962, 1963, and 1965. Although the Fund had records of covered employment for other years, the earnings in those years were insufficient to qualify for pension credits.[1]
 
 
 12
 In 2001, Wilkins met with the Fund's Director, John Virga, and claimed additional benefits based on work not reflected in the Fund's records, but reflected in his SSA statement of earnings. Virga denied Wilkins's claim in a letter dated June 13, 2001, on the ground that the Fund could not determine whether those extra earnings represented covered employment. At that time, when participants sought benefits based on work not reported by employers, it was the practice of the Fund to require them to submit pay stubs (to show that the additional work was performed at the union hourly rate), unless the Fund had conducted a random payroll audit of the employer during the relevant period, and the audit records supported the benefits claim. This Policy on Crediting Hours of Employment in Delinquent Employer Contribution Situations ("Pay Stub Policy") was set down in writing, but it was not incorporated into the plan document.[2] Wilkins submitted no pay stubs, nor employment records of any sort besides the SSA earnings statement. (As he subsequently explained in an affirmation, the employment records he once possessed "had been lost over the years because I had moved and because of a fire which destroyed my records.") Since the Fund had conducted no audits of Wilkins's employers for the years in question and Wilkins had not satisfied the Pay Stub Policy, his claim was denied.
 
 
 13
 Wilkins appealed this denial to the Fund. Virga responded in a letter dated January 14, 2002, which reiterated the need for "evidence that Mr. Wilkins' earnings during the period at issue were for `covered employment' under the Fund." While this letter mentioned pay stubs specifically, it also invited Wilkins's counsel to submit "any other information (including the requested evidence) . . . to the Trustees in connection with Mr. Wilkins's appeal. . . ." In response, Wilkins's attorney wrote that "we have no further evidence that we are able to submit other than an affidavit from Mr. Wilkins that he worked in covered employment for the periods in question." The Fund declined to accept the proffered affidavit, and issued its final denial of benefits in a letter dated October 9, 2002.
 
 
 14
 Wilkins then brought suit in the United States District Court for the Eastern District of New York (Gleeson, J.). He sought redress for a wrongful denial of benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), as well as equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). In doing so, Wilkins claimed additional benefits based on the covered employment that he asserted that he performed, even though such work was not reflected in the Fund's records. And he argued that the Fund's Pay Stub Policy was arbitrary and capricious. He further alleged that the Fund violated its ERISA-based fiduciary duties, see 29 U.S.C. § 1104(a)(1)(B), in several respects: (a) by improperly shifting its burden of keeping accurate records to him, (b) by failing to audit employers' reporting of covered employment, (c) by failing to maintain the records of audits it did conduct, and (d) by failing to warn or advise participants that they could be called upon to produce evidence proving covered employment. Following discovery, the parties cross-moved for summary judgment.
 
 
 15
 The district court granted summary judgment in the Fund's favor in a memorandum and order issued April 7, 2005. Reviewing Wilkins's denial of benefits under an arbitrary and capricious standard, the district court concluded that the Fund's original Pay Stub Policy was arbitrary and capricious. However, the court took notice of a subsequent change in the Fund's practice, so that while the Fund still adhered to its Policy of requiring claimants to show additional covered employment, it dropped its insistence that they produce pay stubs. The court held that it was not arbitrary and capricious for the Fund to require claimants to prove their entitlement to benefits based on earnings not reported. Although the Pay Stub Policy was formally dropped only after Wilkins's claim had been denied, the court found that the Fund had, in fact, afforded Wilkins the opportunity to submit any information he may have had that showed covered employment. Because Wilkins admitted to having no additional information, the court reasoned that he was not entitled to relief on this claim. Wilkins, 2005 WL 783064, at *3, 2005 U.S. Dist. LEXIS 5845, at *17-19.
 
 
 16
 The district court also denied Wilkins's breach of fiduciary duty claims. In the court's view, ERISA's fiduciary duties do not prohibit a fund from requiring participants to bear the burden of showing additional employment when they claim benefits beyond those shown in the funds' records, and while funds are permitted to audit employers' payrolls, see Cent. States, 472 U.S. at 570-71, 105 S.Ct. 2833, they are not required to audit every employer. Wilkins, 2005 WL 783064, at *5, 2005 U.S. Dist. LEXIS 5845, at *14-15. The court also concluded that the record did not support Wilkins's claim that the Fund lost audit records pertaining to his employers. Id. at *5, 2005 U.S. Dist. LEXIS 5845, at *22-23.
 
 
 17
 The court found Wilkins's claim that the Fund had a duty to provide notice of its Policy to be a closer question. The court pointed out that ERISA and its regulations do require all funds to publish an SPD that identifies, inter alia, circumstances which may result in "disqualification, ineligibility, or denial . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide." 29 C.F.R. § 2520.102-3(l). While the Fund's argument that it was in compliance with the SPD requirement rested on a "narrow interpretation" of the regulations, the court concluded that such an interpretation was nonetheless permissible "under the deferential standard of review" the court believed to be applicable. Wilkins, 2005 WL 783064, at *7, 2005 U.S. Dist. LEXIS 5845, at *24. Moreover, assuming arguendo that the Fund's failure to give notice constituted a breach of duty, the court held that Wilkins still could not claim additional benefits, as fiduciary duty violations entitle claimants only to equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which, under Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 215, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), excludes money damages. Wilkins, 2005WL 78064, at *7, 2005 U.S. Dist. LEXIS 5845, at *25.
 
 II
 A. Applicable Causes of Action
 
 18
 ERISA creates six different causes of action, only two of which are relevant here. First, ERISA § 502(a)(1)(B) permits a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). This is "the workhorse of ERISA remedy law [, the provision] under which routine benefit denial and other ERISA claims proceed." John H. Langbein, What ERISA Means by "Equitable": The Supreme Court's Trail of Error in Russell, Mertens, and Great-West, 103 Colum. L.Rev. 1317, 1334 (2003).
 
 
 19
 Second, ERISA § 502(a)(3) authorizes suits "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ." 29 U.S.C. § 1132(a)(3). Section 502(a)(3) has been characterized as a "catch-all" provision which normally is invoked only when relief is not available under § 502(a)(1)(B). Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); see also id. (stating that § 502(a)(3) "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy"). But see Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89-90 (2d Cir.2001) ("Varity Corp. did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available; instead, the district court's remedy is limited to such equitable relief as is considered appropriate."). The provision authorizes solely equitable relief, and under the Supreme Court's decision in Great-West, supra, this means that money awards are available in suits brought under § 502(a)(3) "only in very limited circumstances." Gerosa v. Savasta & Co., 329 F.3d 317, 321 (2d Cir.2003); see also Great-West, 534 U.S. at 211, 122 S.Ct. 708 ("Those rare cases in which a court of equity would decree specific performance of a contract to transfer funds were suits that, unlike the present case, sought to prevent future losses that either were incalculable or would be greater than the sum awarded.").
 
 
 20
 We now turn to Wilkins's claims on appeal.[3]
 
 B. Fiduciary Duty Violations
 
 21
 ERISA § 404(a)(1)(B) imposes a duty on fiduciaries (which include plan administrators)[4] to "discharge [their] duties with respect to a plan solely in the interest of the participants and . . . with the care, skill, prudence, and diligence under circumstances then prevailing that a prudent man acting in a like capacity and familiarity with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Wilkins alleges, in the alternative, that the Fund violated its fiduciary duties (1) by failing to audit his employers, and (2) by failing to maintain adequate records of audits it conducted. Both of these allegations are variations on his general refrain that the Fund improperly shifted its burden of keeping earnings records to plan participants.
 
 
 22
 We reject each of his claims relating to the Fund's audit practices. Wilkins asserts that the Trustees had an obligation to audit his employers, both to confirm his hours of covered employment and to confirm that he was properly included in the bargaining unit.[5] "Under ERISA, trustees have a fiduciary duty to `act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries.'" Diduck v. Kaszycki & Sons Contractors, Inc., 874 F.2d 912, 916 (2d Cir.1989) (quoting Cent. States, 472 U.S. at 571, 105 S.Ct. 2833). But "[i]n performing this duty, trustees have a range of options," and "[t]here is no duty to take any particular course of action if another approach seems preferable." Diduck, 874 F.2d at 917. In Central States, the Supreme Court held that, in discharging their duty, trustees are permitted to conduct random audits of employers' payroll records. See 472 U.S. at 573-74, 105 S.Ct. 2833; see also Jaspan v. Glover Bottled Gas Corp., 80 F.3d 38, 41 (2d Cir.1996). Wilkins cites no authority for the proposition that trustees are required to audit employers continually (as they would need to do to guarantee the accuracy of employers' remittance reports).[6] Of course, if trustees took no effective action to ensure that the Fund received the contributions it was due, such a failure might well constitute a dereliction of fiduciary duty in violation of the standard of ERISA § 404(a)(1)(B). But the record suggests, and Wilkins does not contest, that it was the Fund's practice to conduct random audits of employers. See Wilkins, 2005 WL 783064, at *3, 2005 U.S. Dist. LEXIS 5845, at *13. As a result, the fact that the Fund did not happen to audit Wilkins's employers during the years in question does not, without more, establish a breach of fiduciary duty. See Moore v. Provident Life & Accident Ins. Co., 786 F.2d 922, 928 (9th Cir.1986) ("Under Central States, the trustee of the employee benefit plan had the privilege, not the duty, to audit a member [employer's] record. [The trustee's] failure to audit [the employer's] records, absent an express duty to do it, is not a violation of ERISA.").
 
 
 23
 As to Wilkins's claim that the Fund's failure to keep its audit records of his employers violated a fiduciary duty, the factual predicate of this claim — that the Fund at one time possessed such audit records — finds no support in the record. Wilkins surmises that the Fund must have lost or destroyed audit reports. He does this apparently on the basis of an exchange of letters between his lawyer and the Fund's lawyer. Wilkins's attorney asked whether the absence of audit records on file for one of Wilkins's employees indicated that the firm was not audited, or that the records no longer existed. Letter from Robert J. Bach to Roberta K. Chevlowe (May 31, 2002). An attorney for the Fund responded that "[t]he definitive answer to your question is unknown by the Fund's current personnel." Letter from Roberta Karen Chevlowe to Robert Bach (June 25, 2002). But this exchange is not enough to create a question of fact as to the existence and destruction of such records.
 
 
 24
 Even taking all factual inferences in Wilkins's favor for the purpose of summary judgment, his fiduciary duty claim cannot proceed on the basis of sheer speculation that audit records might have been destroyed. See McClellan v. Smith, 439 F.3d 137, 144 (2d Cir.2006) ("The nonmoving party cannot defeat summary judgment. . . by a factual argument based on conjecture or surmise." (internal quotation marks omitted)). Accordingly, we deny this claim, and we do so without deciding the scope, if any, of a trustee's responsibility to preserve audit records.
 
 
 25
 C. Fund's Failure to Give Notice of its Policy
 
 
 26
 In keeping with ERISA's purpose of ensuring adequate disclosure with respect to pension and welfare plans, see 29 U.S.C. § 1001(a), all plans are required to publish a summary of participants' rights and obligations under the plan, see 29 C.F.R. § 2520.102-2. Among other things, an SPD must set out the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). The regulations further provide that
 
 
 27
 For both pension and welfare benefit plans, [the SPD must include] a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by [the regulations].
 
 
 28
 29 C.F.R. § 2520.102-3(l). See also 29 C.F.R. § 2520.102-3(j)(1) (providing that the SPD for an employee pension plan shall include "a statement describing any other conditions which must be met before a participant will be eligible to receive benefits").
 
 
 29
 Wilkins claims that it was a violation of ERISA and its regulations for the Fund not to give notice of the Policy in the SPD. In his complaint, Wilkins styled this as a breach of the fiduciary duties owed under ERISA § 404(a)(1)(B). But in his briefs, Wilkins argues more specifically — and more germanely — that the failure to give such notice violated ERISA's statutory and regulatory requirements for SPDs.
 
 
 30
 The district court rejected Wilkins's claim on two grounds. First, the court considered the Fund's contention that, because the Policy was not a plan term, but "merely a statement as to how the Pension Fund administers claims for benefits," disclosure of the Policy was not required. Wilkins, 2005 WI 783064, at *7, 2005 U.S. Dist. LEXIS 5845, at *24. Though finding this argument to rest on a "narrow interpretation" of the regulations, the district court concluded that the failure to publish the Policy was not a fiduciary breach when viewed "under the deferential standard of review." Id. Second, the district court found that, even assuming a breach existed, Wilkins was not entitled to the money damages he sought, as suits under § 502(a)(3) are only for equitable relief, and under Great-West, "claims for money damages for breach of fiduciary duty are unavailable for an individual plaintiff." Id. 2005 WL 783064, at *7, 2005 U.S. Dist. LEXIS 5845, at *25.
 
 
 31
 We disagree with both of these rationales for denying relief. With respect to the first, it is true that, where a plan gives discretionary authority to the administrator, benefit denials are reviewed under an arbitrary and capricious standard. See Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir.1995). But Wilkins's SPD claim does not ask us to review either the Fund's exercise of discretion or its interpretation of the plan. Rather, we are called on to judge the Fund's compliance with the applicable statute and regulations. To do this, we must construe ERISA's requirement that "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" be published in the SPD. 29 U.S.C. § 1022(b). In other words, the question before us is simply one of statutory interpretation. And, in such matters, we owe the plan administrators no deference. "The interpretation of ERISA, a federal statute, is a question of law subject to de novo review." Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots, 994 F.2d 692, 694 (9th Cir.1993), quoted in Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 111 (2d Cir. 2003).
 
 
 32
 To be sure, the Second Circuit has never squarely spoken to what standard of review applies in evaluating an SPD's compliance with ERISA, and indeed, we have expressly reserved judgment on the question. See Burke, 336 F.3d at 110; see also Frommert v. Conkright, 433 F.3d 254, 265-66, 266 n. 11 (2d Cir.2006). Challenges to SPDs, in fact, involve different sorts of questions, some of which may call for deferential review while others do not. Thus, the issue of an SPD's compliance may turn on the interpretation of ambiguous language in an SPD. See, e.g., Layaou v. Xerox Corp., 238 F.3d 205, 210-11 (2d Cir.2001) (considering whether the SPD's warning that "the amount you receive may also be reduced if you had previously left the Company and received a distribution at that time" gave adequate notice of the defendant's "phantom account" offsetting). And in such situations, there might be sound reasons for courts to defer to plan administrators' interpretations of the SPDs.
 
 
 33
 But we need not, and hence do not, take any position on such SPD interpretations. For, in the case before us, no provision of the SPD even arguably gives notice of the Policy, and hence, no deference to the Fund's position is appropriate.[7] Accordingly, we hold that where, as here, a claim turns on whether ERISA requires that a practice not mentioned in the SPD be included in the SPD, our review of the SPD's compliance with ERISA is de novo. See also Rhorer v. Raytheon Eng'rs & Contractors Inc., 181 F.3d 634, 639 (5th Cir.1999) (treating SPD compliance with ERISA as a legal question to be reviewed de novo).
 
 
 34
 Before we proceed to an interpretation of the statute and regulations to see if the SPD complied with them, we must, however, review the district court's conclusion that, regardless of compliance, no relief under ERISA is available to Wilkins for this claim. For, if the court is correct, the question of compliance would not in this case be properly the subject of a judicial holding.
 
 
 35
 The district court's starting premise is correct: suits may be brought under § 502(a)(3) only for "those categories of relief that were typically available in equity," Mertens v. Hewitt Assocs., 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), and "classic compensatory . . . damages are never included within" these categories, Gerosa, 329 F.3d at 321. See also Great-West, 534 U.S. at 210-11, 122 S.Ct. 708. We believe, however, that Wilkins's claim may be understood not as a claim for equitable relief under § 502(a)(3), but as a claim to recover plan benefits under § 502(a)(1)(B). Accordingly, the limitations on the forms of relief available under § 502(a)(3) do not apply to his claim.
 
 
 36
 As noted above, § 502(a)(1)(B) empowers a plan participant to sue, inter alia, "to recover benefits due to him under the terms of his plan." Here, the plan states that, depending on the year, participants will be awarded one pension credit for every 150 hours or $750 worth of covered employment. The plan also states that they will receive monthly benefits equal to the total number of pension credits earned multiplied by a certain dollar amount. Wilkins alleges that he did not receive pension credits for all the covered employment he performed, and hence, that he did not receive the full measure of "benefits due to him under the terms of his plan." Had the SPD put him on notice that his benefits might be denied if he failed to preserve and present records of covered employment, it is alleged that he would have been in a position to produce the necessary records and claim his benefits. Thus, the Fund's wrongful failure to inform him of "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" led to his not receiving benefits due him under the terms of the plan. See, e.g., Wilkins Aff. ¶ 27, Opening Br. at 18-20. In other words, Wilkins's challenge to the SPD asserts the elements of a § 502(a)(1)(B) claim.
 
 
 37
 At oral argument, counsel for the Fund countered that, where a denial of benefits claim rests on the assertion of a § 404(a)(1)(B) fiduciary duty violation, § 502(a)(3) is the only avenue of relief available. The Fund's counsel suggested that Strom v. Goldman, Sachs & Co., 202 F.3d 138 (2d Cir.1999), is on point. But the situation in Strom was quite different from that presented in this case. The defendant plan administrator in Strom had failed to process Jonathan Strom's supplemental life insurance policy in a timely manner, so that when Strom died, he did not have the level of coverage he had applied for. Strom's widow sued, inter alia, under § 502(a)(1)(B) for the benefits she would have received had the policy been in effect. Id. at 141. The Second Circuit rejected this claim, holding that § 502(a)(1)(B) only authorizes the recovery of benefits due under the terms of a plan, and, as a result of the defendant's error, Strom never qualified for supplemental life insurance. In the words of the panel, "to enforce the terms of the plan under Section 1132(a)(1)(B) the participant must first qualify for the benefits provided in that plan. As Strom never qualified for the supplemental insurance coverage because he died before [the policy took effect], there is no benefit due under the Plan." Id. at 142 (internal citation and quotation marks omitted); see also id. (citing Varity Corp., 516 U.S. at 515, 116 S.Ct. 1065, for the proposition that no remedy is available under § 502(a)(1)(B) where the plaintiffs were no longer members of the plan).
 
 
 38
 It follows that Mrs. Strom was not permitted to recover under § 502(a)(1)(B) because she was not entitled to any benefits under the terms of the plan. And any possible breach of fiduciary duty by the plan administrator did not alter that fact. See id. at 141. Wilkins, on the other hand, is, by hypothesis, entitled under the plan to the benefit he seeks: a pension calculated on the basis of all his covered employment. (What level of benefits he is due — if any — is, of course, an analytically distinct (and fact-intensive) question that depends on the scale of the underreporting. See infra.) That he has also characterized the Fund's alleged failure to produce a valid SPD as a breach of its duties as a fiduciary in no way forecloses his access to relief under § 502(a)(1)(B). And, as decisions of this court have made clear, "if a summary plan `is inadequate to inform an employee of his rights under the plan, ERISA empowers plan participants and beneficiaries to bring civil actions against plan fiduciaries for any damages that result from the failure to disclose' under 29 U.S.C. § 1132(a)(1)(B)." Layaou, 238 F.3d at 212 (quoting Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir.1990)); see also Burke, 336 F.3d at 114 (holding that, where the plaintiff was likely prejudiced by a defective SPD, she was entitled to recover under § 502(a)(1)(B) the benefits she was due under the plan as construed in light of the SPD).
 
 
 39
 We conclude, then, that Wilkins's SPD claim is cognizable under § 502(a)(1)(B). Accordingly, we must return to the question whether the Fund was required under ERISA to state its Policy in the SPD. We believe that the answer is yes.
 
 
 40
 We begin our analysis of the statute and regulations with the plain meaning of the language used. See Natural Res. Def. Council v. Muszynski, 268 F.3d 91, 98 (2d Cir.2001) (involving statutory interpretation); Forest Watch v. U.S. Forest Serv., 410 F.3d 115, 117 (2d Cir.2005) (involving the interpretation of a regulation). Wilkins quite clearly would "reasonably expect the plan to provide" benefits based on the full measure of his covered employment, as the plan commits to providing this. 29 C.F.R. § 2520.102-3(l). We next ask, then, whether the Policy represents a "circumstance[] which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). Under the Policy, plan participants must produce proof of covered employment as a condition of receiving the benefits to which they are entitled under the terms of the plan, in the event that employers underreport earnings. It seems to us obvious that the Policy, by erecting an additional, mandatory prerequisite to the receipt of promised benefits, may result in disqualification, ineligibility, or a denial or loss of benefits. It must, therefore, be disclosed in the SPD.
 
 
 41
 The SPD looks no more adequate when viewed in light of judicially-imposed standards for disclosure under ERISA. As we have repeatedly observed, "ERISA contemplates that the SPD is an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 764 (2d Cir.2002) (internal quotation marks omitted); see also Layaou, 238 F.3d at 209; Heidgerd v. Olin Corp., 906 F.2d 903, 907 (2d Cir.1990). Given their importance as a source of information for plan participants, SPDs are expected to "explain[] the full import" of the provisions affecting participants. Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1040 (2d Cir.1985). Here, the Fund's SPD does not even mention the Policy, let alone explain its full import (i.e., that participants should save their employment records). Obviously, it falls short of the high standards of clarity and completeness to which SPDs are held. Cf. Layaou, 238 F.3d at 212 (finding that the SPD did not apprise participants of a risk of benefit reduction with adequate clarity and completeness). Accordingly, we conclude that the Fund's SPD does not comply with the requirements of ERISA.
 
 
 42
 Of course, in finding this SPD deficient, "[w]e recognize that an SPD need not `anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status.'" Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 9 (2d Cir.1997) (quoting Lorenzen v. Employees Ret. Plan of the Sperry & Hutchinson Co., 896 F.2d 228, 236 (7th Cir. 1990)); see also Stahl v. Tony's Bldg. Materials, Inc., 875 F.2d 1404, 1408 (9th Cir. 1989) (holding that an SPD "need not discuss every imaginable situation in which such events or actions might occur, but it must be specific enough to enable the ordinary employee to sense when there is a danger that benefits could be lost or diminished"). But employer underreporting was not an "idiosyncratic contingency" for the District Council; rather, it was a persistent and acknowledged problem. More than a decade ago, the government brought a RICO suit alleging that, over a period of twenty years, District Council officials "repeatedly extorted payoffs from employers in exchange for [their] condoning the employers' . . . failure to make payments to the Trust Funds in accordance with collective bargaining agreements." Mason Tenders Dist. Council v. Laborers' Int'l Union, 884 F.Supp. 823, 827 (S.D.N.Y.1995); see also United States v. Cervone, 112 Lab. Cas. (CCH) P11402, 1988 WL 155641, 1988 U.S. Dist. LEXIS 16137 (E.D.N.Y.1988). Accordingly, we hold that where it is the policy of a fund to require participants to produce records of covered employment in the event of employer underreporting, particularly where the fund has a demonstrated history of underreporting, the fund's failure to mention that policy in its SPD is a violation of 29 U.S.C. § 1022(b) and its regulations.
 
 D. Consequences of the Fund's Violation
 
 43
 A deficient SPD does not by itself mean that Wilkins prevails; to recover in this Circuit, a plaintiff must demonstrate "likely prejudice" resulting from a deficient SPD. Burke, 336 F.3d at 113. That is, Wilkins must show that he "was likely to have been harmed as a result of a deficient SPD." Id. The question here is whether it is probable that the plaintiff's benefits would have been different had the SPD been adequate. See id. (citing approvingly to Manginaro v. Welfare Fund of Local 771, I.A.T.S.E., 21 F.Supp.2d 284 (S.D.N.Y.1998)). If the employee can make this showing, "the employer may rebut it through evidence that the deficient SPD was in effect a harmless error" — e.g., that the employee independently knew the information that was wrongfully omitted from the SPD. Burke, 336 F.3d at 113-14.
 
 
 44
 Answering the question of prejudice requires further development of the factual record, and hence a remand to the district court. Wilkins admitted that the pay records he had retained were lost over the years or destroyed in a fire. To show likely prejudice, he must proffer sufficient evidence that, had the SPD given him adequate notice of his burden of proof, he would have taken effective measures either to safeguard these records against such perils, or to obtain and safeguard other competent evidence of covered employment.[8] He must also show that the records or evidence that would have been preserved would be adequate to prove his entitlement to additional benefits. It is also important to note, in connection with this "likely prejudice" inquiry, that ERISA was enacted in 1974, and hence, imposed no duties on the Fund prior to that time. In other words, Wilkins must show, as a threshold matter, either (a) that he was in possession of his pay stubs until 1974 — if the fire and loss of records occurred in 1970, for instance, their destruction would not qualify as harm caused by the defective SPD — or (b) that in 1974, he would still have been able to obtain competent evidence of his prior covered employment that later became unavailable.
 
 
 45
 If Wilkins does demonstrate prejudice, the issue then is to determine the level of additional benefits that he is due. This question should be approached with an awareness that, if this stage of the analysis is reached, Wilkins will have already satisfied the prejudice inquiry — that is, he will have demonstrated that it is likely because of the defective SPD that he has no proof of covered employment. Under the circumstances, we think it is appropriate that the Fund bear the cost of its violation of ERISA, which is to say, that it bear the burden of disproving Wilkins's presumptive entitlement to benefits based on earnings reported to the SSA but not to the Fund. Cf. Motion Picture Indus. Pension & Health Plans v. N.T. Audio Visual Supply, Inc., 259 F.3d 1063, 1067 n. 3 (9th Cir.2001) (holding that burden-shifting to an employer to prove the amount of covered employment may be "appropriate . . . where the fact of damage is itself certain, but the amount is uncertain because of an employer's substandard bookkeeping practices").
 
 
 46
 The Fund can readily meet this burden to the extent that documents show that Wilkins's employers reported his earnings to other union pension funds. (See, e.g., Wilkins's Pension Work Sheet for the years 1961 to 1965 and 1985.) In addition, of course, the Fund could seek the production of relevant records from Wilkins's other pension funds or from his former employers. We note also that Wilkins's claim to benefits appears to depend on a small number of employers.[9] The SSA earnings report seems to show that three of Wilkins's employers — Anthony Cutrupi, Concrete Plank, and Caristo Construction — reported all of his earnings to the Fund. See Table, supra. With respect to two others — Arfal Foundations and Ralph Amore — there is a discrepancy between the amount reported to the Fund and to the SSA, but it appears that, even if all of the work listed was covered employment, it would be insufficient to qualify Wilkins for additional pension credits under the one-credit-per-$750 formula. Wilkins's claims, then, seem to center on Well-Mixed Concrete and Alicer Contracting, both of which apparently had CBAs with other unions to which Wilkins belonged: Well-Mixed Concrete, with the Cement and Concrete Workers' Union, and Alicer Contracting, with Excavators Local 731. But whether it can be shown that some of Wilkins's earnings from these companies was for work performed under the auspices of these other CBAs — and, indeed, whether we are right to surmise, on our reading of the record, that Wilkins's claim turns on these two companies only — are questions to be taken up by the district court only if Wilkins first makes a showing of likely prejudice.
 
 III
 
 47
 ERISA's fiduciary duties do not bar pension benefit plans from requiring their participants to bear the burden of proving that they are owed additional benefits. But if funds intend to have participants shoulder this burden, and if the chance that their own records are inaccurate is more than an "idiosyncratic contingency," then the funds must give notice of this intent in their SPDs. The Fund here did not do so. Accordingly, while we AFFIRM the district court's judgment with respect to Wilkins's audit-related breach of fiduciary duty claims, we VACATE the district court's judgment with respect to Wilkins's challenge to the Fund's SPD, and REMAND to the district court for further proceedings consistent with this opinion. The costs of this appeal shall abide the ultimate outcome of the action.
 
 
 
 Notes:
 
 
 [1]
 Based on the earnings information submitted to the Fund, it appears that Wilkins would also have qualified for a pension credit for his work in 1956, as Arfal reported more than $750 in earnings that year. But as Wilkins does not make this argument, we do not pursue the issue
 
 
 [2]
 This Pay Stub Policy, which has since been abandoned, is to be distinguished from what we refer to throughout this opinion as "the Policy" (i.e., requiring participants to show some proof of covered employment, if not necessarily by means of pay stubs), which is still endorsed by the Fund and which is before us on review. See infra.
 
 
 [3]
 The first issue addressed by the district court below — whether the Pay Stub Policy (and hence, the Fund's denial of benefits on the basis of that policy) was arbitrary and capricious — is not properly before us. The Fund, having revised its policy to accept other forms of evidence, does not contest the district court's conclusion that accepting only pay stubs as proof of covered employment is arbitrary and capricious. For his part, Wilkins does not contest either the district court's finding that he was afforded an opportunity to present evidence other than pay stubs, or the district court's holding that it was not arbitrary and capricious for the Fund to reject what Wilkins offered — namely, a bare assertion, contained in an affidavit, that he had engaged in covered employment
 
 
 [4]
 Here, under Section IX.1 of the plan, the Fund's Board of Trustees is designated as plan administratorSee 29 U.S.C. § 1002(16)(A)(i). Where appropriate, we refer to "trustees" and "plan administrator" interchangeably in the opinion.
 
 
 [5]
 In this respect we note that ten of the eleven years in question — 1956 through 1965 — preceded the enactment of ERISA. ERISA does not provide a remedy for breaches of fiduciary duties that took place entirely prior to that statute's effective dateSee Nolan v. Meyer, 520 F.2d 1276, 1278 n. 2 (2d Cir.1975); see also Morrissey v. Curran, 567 F.2d 546, 549 n. 11 (2d Cir.1977) (noting that pre-ERISA claims may be cognizable as state law claims over which federal courts may assert supplemental jurisdiction). Because one year — 1985 — was unquestionably subject to ERISA, however, we address the merits of Wilkins's argument.
 
 
 [6]
 In his Reply Memorandum of Law in support of his summary judgment motion, Wilkins proposed that employers should be audited every third year, except for those that are habitually delinquent or on the verge of failure: these, he submits, should be audited annually. He cites no authority for this proposition
 
 
 [7]
 Indeed, the Fund's position — that the Policy "was not a plan term, but merely a statement as to how the Pension Fund administers claims for benefits,"Wilkins, 2005 WL 783064, at *7, 2005 U.S. Dist. LEXIS 5845, *24 (internal quotation marks omitted) — is not only not entitled to our deference; it is also not responsive to Wilkins's allegation. The Policy can be both a standard governing the Fund's administration of benefit claims and a "circumstance[] which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b).
 
 
 [8]
 Such evidence might include, for example, affidavits from other workers or supervisors who could attest to his employment on certain jobs covered by the Mason Tenders CBA
 
 
 [9]
 Wilkins's claims are confined to the employers who reported his wages to the Fund: he has not alleged that he worked for other employers who failed to report earnings for him altogether